2019 PA Super 339

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| CHENG JIE LU, | : | |
| Appellant | : | No. 2658 EDA 2017 |

Appeal from the Judgment of Sentence Entered August 3, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009321-2016

BEFORE:  BENDER, P.J.E., MURRAY, J., and PELLEGRINI, J.*

OPINION BY BENDER, P.J.E.:                **FILED NOVEMBER 13, 2019**

Appellant, Cheng Jie Lu, appeals from the judgment of sentence of 3 to 6 months' incarceration, followed by 4 years' probation, imposed after the trial court convicted him, following a non-jury trial, of conspiracy, 18 Pa.C.S. § 903, and promoting, managing, or supervising a house of prostitution business, 18 Pa.C.S. § 5902(b)(1).  On appeal, Appellant avers that the trial court's admission of an out-of-court statement by an unavailable witness violated his Sixth Amendment right to confrontation.  After careful review, we agree with Appellant.  Therefore, we vacate his judgment of sentence and remand for a new trial.

_____

* Retired Senior Judge assigned to the Superior Court.

The trial court summarized the facts underlying Appellant's convictions, as follows:

> On August 18, 2016, Officer Stanley Kaluza received a complaint from the FBI. The complaint originated from the National Center for Missing and Exploited Children (hereinafter "NCMEC") … regarding a Back Page posting of potential underage girls involved in prostitution. The posting was forwarded from NCMEC to the FBI[,] who then forwarded the information to Officer Kaluza. Officer Kaluza investigated [the] Back Page posting…. Officer Kaluza found 20 postings by the same user on August 18, 2016. Officer Kaluza believed there was cause for concern and proceeded to investigate further.
>
> On August 18, 2016, around 7:04 p.m.[,] Officer Kaluza placed a phone call to the number advertised on the Back Page posting, the line rang twice before an "Asian female voice answered," and asked Officer Kaluza if he would like to see her. Officer Kaluza answered affirmatively, and the woman's voice replied that she would send him the address. After waiting a few minutes and not receiving an address, Officer Kaluza placed another call and stated that he would like to come see the voice on the other end of the line. She then said, "Okay I'll send you address." Officer Kaluza then received the address via text and instructions on how to enter the alleged house of prostitution. Officer Kaluza was instructed to make his way to 2422 Rhawn Street, Philadelphia, PA 19152[,] and to enter the brown door on the left[-]hand side of the pizza store and specifically not the pizza store. After the initial text conversation, Officer Kaluza was told the address of the posting would be open until 2:00 a.m. Officer Kaluza then proceeded to make inquiries about prices and was told via text that there were four young girls and that Officer Kaluza could do whatever he wanted for $120 for a half hour or $140 for a full hour. Due to the nature of the complaint, Officer Kaluza sent a text to the number stating he liked young girls, and he received a response that there were six girls to choose from.
>
> On August 18, 2016, at approximately 11:30 p.m., Officer Kaluza arrived, undercover in plain[]clothes, at 2422 Rhawn Street. Officer Kaluza rang the doorbell, and the door was opened by [Appellant]. Officer Kaluza told [Appellant], "I must have the wrong place." [Appellant] shook his head and waved Officer Kaluza into the foyer area of the unit. Officer Kaluza again

ask[ed], "Is this the right place?"[] and [Appellant] replied affirmatively in English. [Appellant] then led Officer Kaluza up the staircase and to the right into a room where Officer Kaluza saw three Asian women dressed in lingerie sitting on a sofa.

[Appellant] then walked Officer Kaluza closer to the three girls. [Appellant] stood on the right of Officer Kaluza and motioned with an open hand indicating that he was presenting the three girls for Officer Kaluza to choose from. At the sight of the presentation, Officer Kaluza asked, "wow, I pick?"[] to which the three girls laughed, but [Appellant] remained silent. At this point Xiu Xui [hereinafter "Xui"], one of the three women presented to Officer Kaluza, asked Officer Kaluza what sort of service he would want. Officer Kaluza replied he just wanted to have fun and chose Xui because she was the female who spoke with him.

Xui then escorted Officer Kaluza up to the third floor of the building. Xui opened the [door to the] front room … and saw a sleeping woman [on the floor]. Xui turned [O]fficer Kaluza around and they made their way to a stripped down bedroom in the rear of the building. Officer Kaluza stated for the record the bedroom was approximately eight-by-eight feet, had a night table, and a bed. Xui placed a bag of condoms and lubricant on the night table and proceeded to count the prerecorded bills Officer Kaluza had brought…. Xui proceeded to give a massage to Officer Kaluza. After some time, Xui stopped the massage, pointed at the condoms, and asked Officer Kaluza if he would like to begin having sexual relations. Officer Kaluza stated he would[,] and [he] proceeded to ask questions to better understand the exact sexual service Xui would provide. Xui pointed to her mouth and vagina, but explained that the girls were not allowed to have anal sex.

At this time, Officer Kaluza only knew of four women, [Appellant], and himself as being the only persons in the building. Officer Kaluza then asked Xui who the man downstairs was. Xui identified [Appellant] as the manager. Officer Kaluza then stated that [Appellant did] not seem very nice[,] and Xui replied by shaking her head. At that point, the arrest team made a non[-] forceful entry because [Appellant] opened the door for the arrest team. Based on Officer Kaluza's belief that [Appellant] was the manager operating this particular prostitution ring, [Appellant] was placed under arrest for operating a house of prostitution. Officer Kaluza's arrest team found $2,900 in the house, a grey iPhone 6S on [Appellant's] person, and purses. Officer Kaluza, in plain clothes, conducted his investigation undercover and at no

point during his investigation identif[ied] himself as a police officer. Only at the time of making the arrest did he identify himself as a police officer.

Trial Court Opinion (TCO), 8/10/18, at 2-5 (footnote and citations to the record omitted).

Appellant was arrested and charged with the above-stated offenses. Prior to his non-jury trial, the Commonwealth filed a motion in *limine*, seeking to admit the hearsay statements that Xui made to Officer Kaluza, namely her remark that Appellant was "the manager." N.T. Trial, 4/11/17, at 56. After lengthy oral arguments by both parties just prior to the start of trial, the court ruled that the statements were admissible under the hearsay exception set forth in Pa.R.E. 803(25)(E) (permitting the admission of a hearsay statement "made by the party's coconspirator during and in furtherance of the conspiracy"). ***See id.*** at 38. Notably, the court did not comment on Appellant's argument that the admission of the statement would violate his Sixth Amendment right to confront witnesses against him, but it implicitly rejected that claim by ruling that the statement was admissible. Appellant's trial then commenced, and at the close thereof, the court convicted him of the above-stated offenses. On August 3, 2017, the court sentenced him to the aggregate term set forth *supra*.

Appellant filed a timely notice of appeal, and he also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court issued its Rule 1925(a) opinion on August 10, 2018. Herein, Appellant presents one issue for our review: "Did the trial

court err, especially in a bench trial, in allowing the admission of hearsay testimony which violated [Appellant's] constitutional right to directly confront the testimony of a witness against him?" Appellant's Brief at 2.

Preliminarily, we observe that, whether the admission of Xui's statement to Officer Kaluza "violated Appellant's rights under the Confrontation Clause is a question of law, for which our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Yohe**, 79 A.3d 520, 543-44 Pa. 2013). As our Supreme Court has explained,

> [i]n **Crawford** [**v. Washington**, 541 U.S. 36 (2004)], a case involving custodial statements, the Supreme Court held "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." **Crawford**, at 68–69, 124 S.Ct. 1354. Specifically, "[w]here testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." **Id.**[] at 68, 124 S.Ct. 1354. The Supreme Court, however, did not provide a specific definition of the type of testimonial statements covered by the Confrontation Clause. As noted above, the Supreme Court identified three possible formulations of the "core class" of testimonial material covered by the Confrontation Clause. Because the statements at issue in **Crawford** were "testimonial under any definition," **id.**[] at 61, 124 S.Ct. 1354[,] the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" **Id.**[] at 68, 124 S.Ct. 1354.

> In **Davis** [**v. Washington**, 547 U.S. 813 (2006)], a case involving statements made to a 911 operator in an emergency situation, the Supreme Court developed the "primary purpose" test to evaluate out-of-court statements which do not squarely fall into the core class. In **Davis**, the Supreme Court distinguished between two types of statements that can be made to a police officer: one category of statements is non[-]testimonial, the other is testimonial. The Supreme Court articulated the distinction as follows:

> Statements are non[-]testimonial when made in the course
> of police interrogation under circumstances objectively
> indicating that the primary purpose of the interrogation is to
> enable police assistance to meet an ongoing emergency.
> They are testimonial when the circumstances objectively
> indicate that there is no such ongoing emergency, and that
> the primary purpose of the interrogation is to establish or
> prove past events potentially relevant to later criminal
> prosecution.

*Davis*, [547 U.S.] at 822, 126 S.Ct. 2266.

***Commonwealth v. Dyarman***, 73 A.3d 565, 571-72 (Pa. 2013).

As is clear from this case law, Appellant's Confrontation Clause turns on whether Xui's statement to Officer Kaluza was testimonial or non-testimonial. To make this determination, we

> must determine whether the primary purpose of the interrogation
> was to establish or prove past events relevant to a later criminal
> prosecution. In making the determination as to the primary
> purpose of an interrogation, a court first should determine
> whether the interrogation occurred during the existence of an
> ongoing emergency, or what was perceived to be an ongoing
> emergency. Although the existence—actual or perceived—of an
> ongoing emergency is one of the most important factors, this
> factor is not dispositive because there may be other
> circumstances, outside of an ongoing emergency, where a
> statement is obtained for a purpose other than for later use in
> criminal proceedings. In determining the primary purpose of an
> interrogation, a court must also objectively evaluate the
> circumstances surrounding the interrogation, including the
> formality and location, and the statements and actions of both the
> interrogator and the declarant.

***Commonwealth v. Allshouse***, 36 A.3d 163, 175-76 (Pa. 2012).

Here, the Commonwealth offers no argument that Xui's statement was provided to Officer Kaluza during the course of an ongoing emergency. Appellant argues that it was not, as Officer Kaluza was not "summoned to

address an ongoing crisis involving potential or actual injury to person or property." Appellant's Brief at 19. We agree with Appellant. Officer Kaluza did not arrive at the scene in response to an emergency call; instead, he came there, at a time of his choosing, for the purpose of conducting an undercover investigation. While the basis for the officer's investigation was the NCMEC tip concerning the possible sexual exploitation of minors, which was understandably concerning to the officer, nothing in the record indicates that Officer Kaluza rushed to the premises believing that a minor was in immediate danger, or that there was any other sort of emergency occurring there. Additionally, nothing in Xui's actions or statements suggested that she believed she was in an emergency situation. Therefore, we conclude that there was no real, or perceived, emergency occurring at the time Xui made the at-issue statement to Officer Kaluza.

Instead, viewing the circumstances of Xui's statement objectively, we agree with Appellant that the primary purpose of Officer Kaluza's interrogation was "to establish or prove past events potentially relevant to later criminal prosecution." **Davis**, 547 U.S. at 822. Again, Officer Kaluza was present at the location for the purpose of conducting an undercover investigation into potential prostitution. Once the officer entered the premises, his suspicions of criminal activity were confirmed by the actions and statements of Appellant and Xui. Notably, prior to asking the question that elicited Xui's at-issue statement, Officer Kaluza surreptitiously radioed for backup. N.T. Trial, 4/11/17, at 6, 56. The officer then continued to question Xui, asking her

- 7 -

"who's the male downstairs?" Xui replied, "he's the manager." *Id.* at 56. When Officer Kaluza then said that Appellant "doesn't seem very nice[,]" Xui "just shook her head and wouldn't say anything more." *Id.*

The officer's question about who Appellant was had no clear relevance to his interaction with Xui, or to his decision to call in his backup officers, which he did just prior to asking that question. Moreover, Appellant's actions of letting the officer into the building, leading him upstairs, and gesturing to the lingerie-clad women as if offering them for the officer to pick was certainly enough to establish probable cause to arrest Appellant, yet the officer still questioned Xui about Appellant's identity. Viewing these circumstances objectively, it is apparent that "the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. Thus, Xui's statement was testimonial.

We also conclude that the case on which the Commonwealth relies, *Commonwealth v. Holton*, 906 A.2d 1246 (Pa. 2006), does not require us to reach a different result. In *Holton*, an undercover officer purchased drugs from Holton through a woman, Tanya Fitts, who took the officer's money, went inside a bar, and returned to the officer's vehicle with the drugs. *Id.* at 1248. Ms. Fitts indicated to the undercover officer that she had obtained the drugs from Holton. *Id.* In concluding that Ms. Fitts' statement to the officer was non-testimonial, this Court principally relied on *Crawford* and *United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005) (holding that statements "surreptitiously intercepted by law enforcement" through wiretaps were non-

testimonial "because they do not fit within the framework given by **Crawford** to define 'testimonial' statements"). In particular, the **Holton** panel focused on the fact that Ms. Fitts' statements did "not fall within any of the three specific examples of 'testimonial' evidence given by the **Crawford** Court," as they were not "*ex parte* in-court testimony or its functional equivalent, … extrajudicial statements … contained in formalized … materials, such as affidavits, depositions, prior testimony, or confessions[, or] … statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." **Holton**, 906 A.2d at 1254 (quoting **Crawford**, 541 U.S. at 51-52) (internal quotation marks omitted)). Additionally, the **Holton** panel also relied on **Hendricks** to conclude that the statements were non-testimonial because Ms. Fitts did not know that the undercover patrolman was a police officer and, as such, her "admissions were unwittingly made, without any indication that these statements may be used at a later time for prosecutorial purposes." **Id.** at 1254 (citing **Hendricks**, 395 F.3d at 183).

Importantly, **Holton** was premised exclusively on cases issued after **Crawford** and before **Davis**, which unquestionably expanded upon, and clarified, **Crawford's** distinction between testimonial and non-testimonial statements. As mentioned *supra*, the **Crawford** Court explicitly declared that it left "for another day any effort to spell out a comprehensive definition of 'testimonial[,]'" and it was only in **Davis** that the Court "developed the 'primary purpose' test to evaluate out-of-court statements which do not

squarely fall into the core class" of testimonial statements defined in ***Crawford***. ***Dyarman***, 73 A.3d at 572 (quoting ***Crawford***, 541 U.S. at 68). While ***Holton*** was decided shortly *after* ***Davis*** and the panel acknowledged the High Court's holding in that case, ***see Holton***, 906 A.2d at 1254, the ***Holton*** panel did not discuss ***Davis*** or apply its "primary purpose" test to discern the nature of Ms. Fitts' out-of-court statements. Instead, the ***Holton*** panel merely discussed why her remarks did not fit into ***Crawford's*** "core class" of testimonial statements, and compared the case to the pre-***Davis*** decision in ***Hendricks***. Because the ***Holton*** panel did not apply the "primary purpose" test created in ***Davis***, as we do herein, we are not bound by the result reached in ***Holton***.

In sum, we conclude that Xui's statement to Officer Kaluza that Appellant was "the manager" was testimonial. Therefore, the trial court erred by admitting it when Xui was unavailable and Appellant did not have the opportunity to cross-examine her. Accordingly, we vacate Appellant's judgment of sentence and remand for a new trial.[1]

Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Pellegrini joins this opinion.

Judge Murray files a dissenting opinion.

---

[1] In light of this disposition, we need not address Appellant's remaining challenge to the admission of Xui's statement under the rule precluding hearsay evidence.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/13/19</u>